**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Thomas PEARSON, Defendant–
Appellant.**

No. 00–30086.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 9, 2001

Filed Dec. 18, 2001

David B. Adler, Seattle, Washington, for the defendant-appellant.

Katrina C. Pflaumer, United States Attorney, Seattle, Washington, and Helen J. Brunner, Assistant United States Attorney, Seattle, Washington, for the plaintiff-appellee.

Before: McKEOWN, W. FLETCHER and RAWLINSON, Circuit Judges.

RAWLINSON, Circuit Judge:

Appellant, Thomas Pearson ("Pearson"), was convicted of violating criminal provi-

sions of the Clean Air Act ("CAA"), 42 U.S.C. §§ 7412(f)(4) and (h), and 7413(c)(1). Pearson appeals his conviction on several grounds. First, he contends the district court improperly instructed the jury regarding the elements of the charged offense. Next, Pearson asserts the district court prohibited him from presenting a defense by improperly sustaining objections to his testimony during direct examination. Finally, Pearson challenges the sentencing enhancements applied pursuant to §§ 2Q1.2(b)(1)(B) and 2Q1.2(b)(2) of the United States Sentencing Guidelines ("U.S.S.G.").

We affirm the district court's rulings.

## FACTUAL BACKGROUND

In 1995, the Navy embarked on a project to remove asbestos-containing material, as part of an upgrade and renovation of the Central Heating Plant at the Whidbey Island Naval Air Station. The Navy contracted with Metcalf Grimm to carry out the renovations. Metcalf Grimm, in turn, subcontracted with Environmental Maintenance Service, Inc. ("EMS") to conduct both the asbestos abatement and the demolition work.

Work on the project took place in three phases, only the third of which is relevant to this appeal.[1] The third phase of the project involved the removal of asbestos from the main part of the boiler house, including the removal of asbestos from the boilers and associated equipment. While the project was being performed, a containment structure constructed from plastic sheeting was placed around the area designated for asbestos removal. The purpose of the containment structure is to prevent the release of asbestos fibers to the outside air. This goal is further accomplished by using negative air machines to create lower pressure within the containment area, thereby preventing the release of air from the containment area. Inside the containment area, asbestos removal was performed by workers with respiratory protection.

Asbestos work practice regulations promulgated pursuant to the CAA require that asbestos be adequately wet before removal. 40 C.F.R. § 61.141. The regulations also govern the proper handling of asbestos during its removal. *See id.*

Around June 17, 1996, Pearson was hired by EMS, in part because he was a certified asbestos supervisor. Witnesses testified at trial that Pearson was their supervisor for the entire period he worked on the project. According to witnesses, Pearson performed functions such as correcting time cards, instructing others on how much water to use, and conducting daily meetings to give instructions to the crew.

Pearson was charged with two counts of knowingly causing the removal of asbestos-containing materials without complying with the applicable work practice standards, in violation of the CAA, 42 U.S.C. §§ 7412(f)(4) and (h), and 7413(c)(1). Each count carries a statutory maximum penalty of five years imprisonment. 42 U.S.C. § 7413(c)(1).

---

1. Phase 1 was a project which took place in April 1996, involving the removal of asbestos from valves on hot active steam lines. This phase had no relevance to any of the charges against Pearson. Phase 2 related to asbestos removal from June 20–22, 1996. Work performed during this period related to Count 1 of the Indictment, of which Pearson was acquitted. Phase 3 involved the removal of asbestos from the boiler house beginning on June 24 and gave rise to Count 2, of which Pearson was convicted.

During trial, testimony was presented that the work practice standards were not followed, at Pearson's direction. Less than the appropriate amount of water was used to wet the asbestos. Additionally, dry asbestos was "all over the place." Containment walls were pulled away from the ceiling, with work continuing. Some of the negative air machines were clogged, and one Navy inspector testified that she saw bags of asbestos outside the containment area, with asbestos material on the exterior surface of the bags.

Pearson's defense was that he was not involved at any time with the removal of asbestos, either as a supervisor or as a worker. He asserted that he was only involved with the demolition phase of the project. Pearson was acquitted of Count 1 and convicted of Count 2, with the jury specifically finding that Pearson acted in a supervisory capacity.

Prior to sentencing, both Pearson and the Government submitted extensive memoranda to the court. At the sentencing hearing, the district court entertained a one-hour presentation from Pearson's counsel.

U.S.S.G. § 2Q1.2 sets a base offense level of 8 for a conviction under 42 U.S.C. § 7413. The district court applied a four-level enhancement under § 2Q1.2(b)(1)(B) for discharging hazardous materials into the environment, and a nine-level enhancement under U.S.S.G. § 2Q1.2(b)(2), for causing a risk of death or serious bodily injury. Finally, the district court applied a two-level enhancement under U.S.S.G. § 3B1.1 for defendant's leadership role in the offense, and refused to grant a two-level reduction under U.S.S.G. § 3E1.1 for acceptance of responsibility. These calculations resulted in an adjusted offense level of 23.

The district court then applied three separate downward departures: (1) a two-level downward departure under Application Note 5 to U.S.S.G. § 2Q1.2 (degree of harm); (2) a five-level departure under Application Note 6 (degree of risk); and (3) a four-level departure for aberrant behavior. These departures resulted in a total offense level of 12, with a sentencing range of 10 to 16 months. Pearson was sentenced to 10 months incarceration to be followed by a three-year period of supervised release.

## DISCUSSION

The CAA was passed to protect and enhance the quality of the Nation's air resources. 42 U.S.C. § 7401(b) (1995). To accomplish this goal, the CAA directs the Environmental Protection Agency ("EPA") to prescribe and enforce emission standards for the control of hazardous air pollutants. 42 U.S.C. § 7412(d). Where control is not feasible, the EPA is to promulgate work practice standards designed to achieve a reduction in emissions. *Id.* and § 7412(h)(1). Under the CAA, asbestos is a hazardous air pollutant. 42 U.S.C. § 7412(a)(6), (b)(1). The EPA has determined that asbestos contamination cannot be feasibly addressed by promulgating emission standards. Thus, work practice standards were devised for the removal of asbestos-containing material during the demolition and renovation of affected buildings. 40 C.F.R. § 61.145.

40 U.S.C. § 7413(c) provides criminal penalties for a limited class of individuals who fail to follow the CAA's regulations. Individuals who may be criminally liable include the "owner or operator of a demolition or renovation activity" that involves "regulated asbestos-containing material." 40 C.F.R. § 61.145(a); *see also United*

*States v. Dipentino,* 242 F.3d 1090, 1096 (9th Cir.2001).[2] The owner or operator of a demolition or renovation activity is defined in the federal regulation as any person who "owns, leases, operates, controls or supervises" the facility being demolished or renovated, or supervises the demolition or renovation activity, or both. 40 C.F.R. § 61.141. This definition parallels that found in 42 U.S.C. § 7412, where "owner or operator" for purposes of that section is defined as "any person who owns, leases, operates, controls, or supervises a stationary source." Persons excluded from the definition of "a person" are employees carrying out their normal activities, acting under orders from their employer, except in the case of knowing and willful violations. 42 U.S.C. § 7413(h).

## I. *The Jury Instructions*

Pearson contends the district court erroneously defined the term "supervisor" as it is used in the CAA. According to Pearson, a supervisor under the CAA must have a higher degree of control and authority than that defined by the district court. Pearson also asserts error based on instructing the jury that a supervisor's liability is dependent upon proof of a knowing violation. According to Pearson, this instruction prevented the jury from considering whether, as a supervisor, he could also be an employee carrying out his normal activities, and acting under orders from his employer. Finally, Pearson contends the district court failed to properly define the term "owner or operator" as it is used in the CAA.

■ We review the district court's interpretation of the statute, and whether the jury instructions misstated the elements of the offense de novo. *See United States v. Middleton,* 231 F.3d 1207, 1209 (9th Cir. 2000). If Pearson's theory of defense was conveyed, we will affirm, because he "is not entitled to any particular form of instruction." *United States v. Romero–Avila,* 210 F.3d 1017, 1023 (9th Cir.2000) (quoting *United States v. Lopez–Alvarez,* 970 F.2d 583, 597 (9th Cir.1992)).

### A. Supervisor Liability

■ Pearson contends the district court failed to properly define the term "supervisor" as it is used in the CAA.[3] He alleges control and authority are hallmarks of the definition of the term "supervisor." Additionally, he posits that the definition of "supervisor" should include some degree of dominion. According to Pearson, the acts that would make someone a "supervisor" are responsibilities for reporting; applying for permits; designing the work plan; interfacing with multiple contractors and regulatory agencies; signing off on waste disposal manifests, designing and building the containment area; determining the number of negative air machines and the type of respiratory protective equipment; ordering and receiving supplies; and firing people for cause. In sum, Pearson contends he did not have enough authority to be liable as a "supervisor" under the CAA.

The district court defined the term "supervisor" as follows:

> In order to be a supervisor, it is not enough that the defendant was present at the job site or participated in asbestos abatement/removal activities, or even that he had the job title "supervisor."

---

**2.** Regulated asbestos-containing material is referred to as "RACM" in the regulations.

**3.** The degree of authority necessary to be a "supervisor" is not defined in either 42 U.S.C. § 7412 or § 7413.

The defendant must have had significant and substantial control over the actual asbestos abatement work practices.

▇▇▇ In determining the scope of authority necessary to meet the definition of "supervisor" under the CAA, we have held that "substantial control" is the governing criterion. *See United States v. Walsh*, 8 F.3d 659, 662–63 (9th Cir.1993); *see also Dipentino*, 242 F.3d at 1096. Under the CAA, a defendant need not possess ultimate, maximal, or preeminent control over the actual asbestos abatement work practices. Significant and substantial control means having the ability to direct the manner in which work is performed and the authority to correct problems.[4] On any given asbestos abatement project there could be one or more supervisors. The term "supervisor" is not limited to the individual with the highest authority. Accordingly, we find the district court did not abuse its discretion in instructing the jury that Pearson had to have significant and substantial control to be liable as a supervisor.[5]

B. The Exclusion of Certain "persons" under § 7413(h)

▇▇▇ An employee "who is carrying out his normal activities and who is acting under orders from the employer," cannot be liable under the CAA's criminal provisions as an operator, except in the case of knowing and willful violations. 42 U.S.C. § 7413(h). Whether an individual found to be a supervisor under § 7412 can also be an employee under § 7413(h) is an issue of first impression. We find that an individual can be both.

▇▇▇ Applying normal principles of statutory construction, we first look to the plain meaning of the statute. *Eisinger v. Fed. Lab. Rel. Auth.*, 218 F.3d 1097, 1102 (9th Cir.2000). The plain meaning of the statute will control unless the statutory language can lead to more than one reasonable interpretation. *A–Z Int'l v. Phillips*, 179 F.3d 1187, 1192 (9th Cir.1999). If there is more than one reasonable interpretation, we turn to legislative history, looking to the entire statutory scheme. *United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir.1999).

The CAA itself does not define the term employee.[6] The government argues "the term [employee] cannot apply to those in supervisory positions that are responsible for giving orders to others." Pearson con-

---

4. The Labor Management Relations Act ("LMRA") defines supervisor as:

"any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a routine or clerical nature, but requires the use of independent judgment." 29 U.S.C. § 152(11).

Under this definition, Pearson was clearly a supervisor.

5. Pearson also alleges the district court erred in giving an instruction which subjected him to criminal liability as a supervisor of a "reno-

vation or demolition" project. The CAA, through 40 C.F.R. § 61.145(a), explicitly applies to owners or operators of a "demolition or renovation" project.

6. Since the regulations do not define the term "employee" differently than its common usage, we turn to the dictionary. *McHugh v. United Serv. Auto. Ass'n.*, 164 F.3d 451, 455 (9th Cir.1999) (using Webster's Ninth New Collegiate Dictionary to find common usage). We thereby define employee as "a person employed by another for salary or wages." *Webster's New World Dictionary of the American Language* 201 (1983).

tends the jury could have plausibly found he was a supervisor, but still carried out his normal activities and acted under orders from his employer.

Section 7413(h) of the CAA has four provisions, which correspond to the four sentences in the subsection. Each of the last three excludes a different class of individuals from the definition of "persons" under the statute, absent a showing of knowledge and willfulness. Only the fourth sentence is directly relevant here. It applies to cases brought under subsection c, paragraphs 1, 2, 3, and 5 of the CAA, such as this one, and does not explicitly exclude senior management personnel and corporate officers from the definition of "employees." Therefore, we hold that a supervisor may be excluded from the definition of a "person" under the CAA, based on the final provision of § 7413(h).

Although § 7413(h) is clear on its face, legislative history offers additional support for our holding. Congress amended the CAA, as it related to the meaning of a "person" under § 7413, because it wanted to eliminate "the special treatment afforded 'non-management employees' in the case of knowing and willful violations."[7] *Clean Air Act Amendments–Conference Report*, 136 Cong. Rec. S16895–01, *16895 (October 27, 1990). Since Congress clearly excluded senior management personnel and corporate officers under the second and third provisions of § 7413(h), we are not at liberty to insert similar terms into the fourth. *See Foti v. City of Menlo Park*, 146 F.3d 629, 639 (9th Cir.1998).

While we agree that a supervisor under § 7412 may also be an employee, failure to give such an instruction in this case was not error because Pearson failed to meet his initial burden of establishing the provision was applicable in this case. Pearson contends his "status as a supervisor or non-supervisory employee who was just following orders is not an affirmative defense." He asserts that the Act defines affirmative defenses to criminal prosecution at 42 U.S.C § 7413(c)(5)(C); thus, the government had the burden of establishing he was not an excluded "person" for purposes of § 7413(h). *See id.*

Pearson's contention is erroneous. When a statutory prohibition is broad and a defendant seeks to apply a narrow exception to the prohibition, it is more likely than not that the exception is an affirmative defense. *See United States v. Freter*, 31 F.3d 783, 788 (9th Cir.1994). Such a construction was clearly intended by Congress. The Conference Committee stated in unambiguous terms:

> These provisions create a new affirmative defense to criminal actions under certain parts of section [7413]. As such, once the government has satisfied its burden to prove a "knowing" violation in the traditional sense, the burden will shift to the person seeking to claim the defense and the defendant must prove that he was acting under his employer's orders or carrying out normal activities. Only after a defendant has satisfied that burden will the government be required to prove that the defendant's actions were willful.

*Conference Report*, 136 Cong. Rec. at S16952.

Pearson did not raise or establish that he was an employee carrying out his normal activities and acting under orders from his employer. In fact, Pearson consistently maintained that he had nothing to

---

**7.** Section 113(c) of the CAA was codified as 42 U.S.C. § 7413(h).

do with asbestos clean-up. Accordingly, the district court properly excluded such an instruction. *See Romero–Avila,* 210 F.3d at 1023 (requiring instruction only if it is supported by law and has some foundation in the evidence).

### C. The Definition of "Owner–Operator"

 Pearson's next argument is that the district court failed to properly define the term "owner or operator" as that phrase is used in the CAA. We review the district court's formulation of jury instructions for abuse of discretion, and uphold them so long as the instructions provided sufficient guidance on all the issues. *United States v. Ewain,* 88 F.3d 689, 695 (9th Cir.1996).[8] The term "owner or operator" applies to any person who owns, leases, operates or supervises a demolition or renovation project, including the removal of regulated asbestos-containing material. 40 C.F.R. § 61.141.

The district court did not provide the jury with the statutory definition of owner or operator; rather, the instruction given by the district court focused on that part of the definition of "owner or operator" applicable to this case: the word "supervises." Pearson was charged with, and the Government had the burden of proving, that Pearson supervised a demolition or renovation project. The district court provided sufficient guidance on all the issues, and did not abuse its discretion by focusing its definition of "owner or operator" on the supervisory aspect of the charged offense.

### II. *Pearson's Direct Examination*

 During Pearson's direct examination, the district court sustained objections to numerous questions posed by defense counsel on the ground that the questions were leading. Pearson contends the district court thereby prevented him from directly answering the charges against him. We review the district court's decision to permit or disallow leading questions for abuse of discretion. *See United States v. Castro–Romero,* 964 F.2d 942, 943 (9th Cir.1992). We will only reverse the district court if the sustained objections "amounted to, or contributed to the denial of a fair trial." *See id.* (quoting *Miller v. Fairchild,* 885 F.2d 498, 514 (9th Cir.1989)).

The questions at issue related to Pearson's knowledge of falling asbestos. Pearson's defense, however, was not related to whether asbestos actually fell. Rather, his position was that he had nothing to do with asbestos removal. The district court's evidentiary rulings did not prevent Pearson from receiving a fair trial.

### III. *Sentencing*

 Pearson contends that the district court improperly enhanced his sentence because there were insufficient facts to support findings that hazardous substances were discharged into the environment, resulting in a substantial likelihood of death or serious bodily injury.[9] We review the district court's interpretation and application of the sentencing guide-

---

**8.** 40 C.F.R. § 61.141 defines "Owner or operator" as "any person who owns, leases, operates, controls, or supervises the demolition or renovation operation, or both." 42 U.S.C. § 7412(a)(9) similarly states: "The term owner or operator means any person who owns, leases, operates or supervises ..." 40 C.F.R. § 61.145 provides: "The requirements ... apply to each owner or operator of a demolition or renovation activity, including the removal of [regulated asbestos-containing material]...."

**9.** Pearson also alleges that his sentence was unconstitutional based on the reasoning of *Apprendi v. New Jersey,* 530 U.S. 466, 120

lines de novo. *United States. v. Cooper,* 173 F.3d 1192, 1204 (9th Cir.), *cert. denied* 528 U.S. 1019, 120 S.Ct. 526, 145 L.Ed.2d 408 (1999). We review the district court's factual findings underlying the sentence for clear error, *United States v. Shannon,* 137 F.3d 1112, 1119 (9th Cir.1998), and its decision not to hold an evidentiary hearing for abuse of discretion, *United States v. Houston,* 217 F.3d 1204, 1207 (9th Cir. 2000).

■■■ As an initial matter, we find the district court acted within its discretion in denying Pearson's request for an evidentiary hearing. Rule 32(c)(1) of the Federal Rules of Criminal Procedure requires that the court "afford counsel for the defendant . . . an opportunity to comment on the probation officer's determinations and on other matters relating to the appropriate sentence." During the sentencing hearing, Pearson's counsel was allowed to present objections to the pre-sentence report. The district court specifically made findings regarding Pearson's objections, in accordance with Rule 32(c)(1). The court has discretion to determine whether it will "permit the parties to introduce testimony or other evidence on the objections." *Id.* There is nothing in the record to support Pearson's claim that the district court abused its discretion in this regard.

A. U.S.S.G. § 2Q1.2(b)(1)(B) Enhancement

U.S.S.G. § 2Q1.2(b)(1)(B) allows the district court to increase a defendant's offense level by four levels "if the offense otherwise involved discharge, release, or emission of a hazardous or toxic substance or pesticide." We have interpreted § 2Q1.2(b)(1)(B) of the U.S.S.G., in conjunction with Application note 5, as requiring release or emission "into the environment," *United States v. Ferrin,* 994 F.2d 658, 662 (9th Cir.1993), and a showing that the environment was actually contaminated by the hazardous or toxic substance.[10] *United States v. Van Loben Sels,* 198 F.3d 1161, 1164 (9th Cir.1999). We have defined contamination as "to soil, stain, or infect by contact or association, or to make . . . impure by admixture." *United States v. Ferrin,* 994 F.2d at 664 (citing *Webster's New Collegiate Dictionary* 245 (1977)). We have defined "environment" as "surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air[11] within the United States or under the jurisdiction of the United States." *Id.* (quoting 42 U.S.C. § 9601(8).)

S.Ct. 2348, 2362–63, 147 L.Ed.2d 435 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). Pearson's stance that the term "statutory maximum" refers to the term provided for by the sentencing guidelines is a fundamental misstatement of the law. We have never used the term "statutory maximum" to refer to the term established in the sentencing guidelines. Rather, the term "statutory maximum" refers to the maximum term set by Congress. Because Pearson's sentence of ten months does not exceed the statutory maximum of five years, *Apprendi* does not invalidate the enhancements imposed by the district court. *United*

*States v. Scheele,* 231 F.3d 492, 497 n. 2 (9th Cir.2000) (noting that defendant is not prejudiced under *Apprendi* when his sentence is less than the statutory maximum).

**10.** Application note 5 to § 2Q1.2(b)(1)(B) provides in part, "Subsection (b)(1) assumes a discharge or emission into the environment resulting in actual environmental contamination."

**11.** The EPA's office of Air Quality Planning has defined ambient air as air which is outdoors. "Once indoors, air is no longer 'external to buildings' and is thus not considered ambient air." *Letter Clarification of Definition of Ambient Air,* (April 13, 1992), *available at http://www.epa.gov/ttn/nsr/gen/memo-x.html.*

In applying this enhancement, the district court referred to "testimony about [asbestos] dust on the outside of the bags" and "the drains being clogged with [asbestos] fibers." From this evidence the court drew an inference that hazardous waste was released "into the environment."

"A finding that the hazardous waste came into contact with the land or water, or was released into ... [outdoors] air is the established predicate for enhancement under section (b)(1)." *See Ferrin*, 994 F.2d at 664. The court's finding that asbestos was released into the outside air was not clearly erroneous. Accordingly, Pearson's challenge to the district court's enhancement based on U.S.S.G. § 2Q1.2(b)(1)(B) fails.

B. U.S.S.G. § 2Q1.2(b)(2) Enhancement

■ U.S.S.G. § 2Q1.2(b)(2) permits the district court to increase the defendant's offense level by nine levels if the offense resulted in a substantial likelihood of death or serious bodily injury. The Court applied this enhancement based on its finding that Pearson violated, and instructed others to violate, the work practice standards, resulting in conditions where asbestos was not stored, or removed properly. The federal government has recognized asbestos as a health hazard and it is generally accepted that exposure to asbestos can cause mesothelioma, asbestosis, lung cancer; and cancers of the esophagus, stomach, colon, and rectum. *Occupational Safety & Health Administration ("OSHA") Fact Sheet: Better Protection Against Asbestos in the Workplace* (January 1, 1993), *available at* http://www.osha-slc.gov/OshDoc/Fact_data/FSNO93–06.-html. Pearson's noncompliance with the work practice standards created a substantial likelihood that workers would be exposed to life-threatening asbestos fibers. Accordingly, the nine-level enhancement was properly applied.

AFFIRMED.