**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee,*

v.

GENTRY CARL LaBUFF,
              *Defendant-Appellant.*

No. 10-30274

D.C. No.
4:10-cr-00023-
SEH-1

OPINION

Appeal from the United States District Court
for the District of Montana
Sam E. Haddon, District Judge, Presiding

Submitted June 8, 2011*
Portland, Oregon

Filed July 1, 2011

Before: Raymond C. Fisher, Ronald M. Gould, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Paez

---

*The panel unanimously concludes this case is suitable for decision
without oral argument. *See* Fed. R. App. P. 34(a)(2).

## COUNSEL

Daniel Donovan, Attorney at Law, Great Falls, Montana, for the appellant.

Michael W. Cotter, U.S. Attorney, and E. Vincent Carroll, Assistant U.S. Attorney, Great Falls, Montana, for the appellee.

**OPINION**

PAEZ, Circuit Judge:

The Major Crimes Act, 18 U.S.C. § 1153, provides federal criminal jurisdiction for certain crimes committed by Indians in Indian country.[1] We previously have noted that determining who is an Indian under § 1153 is not easy, as the statute does not define the term "Indian." *United States v. Maggi*, 598 F.3d 1073, 1075 (9th Cir. 2010) (citing *Felix S. Cohen's Handbook of Federal Indian Law* at 24 (Rennard Strickland et al. ed., 1982)). Our circuit, however, has developed a specific framework for determining whether a person can be prosecuted by the federal government under § 1153. To meet its burden, the government must prove both that the defendant has a sufficient "degree of Indian blood" and has "tribal or government recognition as an Indian." *United States v. Bruce*, 394 F.3d 1215, 1223 (9th Cir. 2005) (internal quotations omitted).

Gentry Carl LaBuff was charged with robbery and aiding and abetting robbery in Indian country in violation of 18 U.S.C. §§ 1153(a) and 2111. A jury convicted LaBuff of these charges following a two-day trial. On appeal, LaBuff contends that the government did not present sufficient evidence to establish that he is an "Indian" for purposes of prosecution under § 1153. We disagree and conclude that, in light of all the evidence presented at trial, a reasonable trier of fact could have found that LaBuff is an Indian. We therefore affirm his conviction.

---

[1]"[T]he term 'Indian country' . . . means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government . . . (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof . . . and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same." 18 U.S.C. § 1151.

# I[2]

LaBuff was born in 1979 to Levi Samuel LaBuff and Margie Downey. His mother is white and his father is an enrolled member of the Blackfeet Tribe. The Blackfeet are a federally recognized tribe based in northern Montana. Given his parents' heritage, LaBuff is 5/32 Blackfeet Indian and 1/16 Cree Indian.

Because LaBuff's father is a member of the Blackfeet Tribe, the Tribe designated LaBuff as a "descendant of a member"[3] of the tribe. LaBuff, however, is not an enrolled member of the Blackfeet Tribe or any other Indian tribe. LaBuff's descendant status entitles him to receive medical care at the Blackfeet Community Hospital, to receive educational grants, and to fish and hunt on the reservation. The Blackfeet Community Hospital is a federally-operated facility under the authority of the Indian Health Service. The hospital's non-emergency services are limited to enrolled tribal members and other non-member Indians. Because the hospital recognizes LaBuff as an Indian person, he has received free health care services there since 1979.

LaBuff was born and raised on the Blackfeet Reservation. As a child, LaBuff attended a public school on the reservation that is open to non-Indians. With the exception of a brief six-month period when LaBuff lived in Washington State, he has

---

[2]This factual background is drawn from the witnesses who testified at trial on behalf of the government and from the several witnesses that LaBuff called in his own defense. These witnesses testified not only about the circumstances of the alleged robbery, but also about LaBuff's status as a Blackfeet descendant and his connection to the Blackfeet Reservation. As we must, we review the trial evidence in the light most favorable to the government. *United States v. Nevils*, 598 F.3d 1158, 1163-64 (9th Cir. 2010) (en banc) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[3]As we noted in *Maggi*, "[w]hile descendant status does not carry similar weight to enrollment . . . it reflects some degree of recognition." 598 F.3d at 1082.

lived on the reservation his entire life. Although LaBuff has descendant status, he is not eligible to vote in tribal elections and he has not otherwise participated in tribal cultural activities.

On multiple occasions, LaBuff has been arrested, prosecuted, and convicted of crimes under the jurisdiction of the tribal court. LaBuff, however, has never before challenged the tribal court's exercise of jurisdiction on the basis of his alleged status as a non-Indian.

On October 25, 2008, LaBuff and his cousin robbed a Subway restaurant that was located within the boundaries of the Blackfeet Reservation in Browning, Montana. They were arrested and charged by indictment with robbery and aiding and abetting robbery in violation of 18 U.S.C. § 2111, which is a federal offense when committed by an Indian on an Indian reservation, 18 U.S.C. § 1153. LaBuff pleaded not guilty and proceeded to trial, where his Indian status was a contested issue. At the close of the government's case-in-chief, LaBuff moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 on the ground that the evidence presented by the government was insufficient to establish his Indian status beyond a reasonable doubt. The district court denied the motion. At the conclusion of the trial, LaBuff renewed his motion for a judgment of acquittal. The court reserved ruling on LaBuff's renewed motion. The jury subsequently found LaBuff guilty and the district court denied LaBuff's renewed motion for judgment of acquittal. Following imposition of a 62-month prison sentence, LaBuff timely appealed.

## II

We review *de novo* the sufficiency of the evidence, *United States v. LeVeque*, 283 F.3d 1098, 1102 (9th Cir. 2002), and consider whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original).

## III

**[1]** Native American tribes generally have exclusive jurisdiction over crimes committed by Indians against Indians in Indian country. Two federal statutes, however, provide for federal jurisdiction over such crimes. The first statute, 18 U.S.C. § 1152, known as the General Crimes Act,[4] grants federal jurisdiction over certain crimes committed by non-Indians against Indians in Indian country, but excludes crimes committed by one Indian against another. The second statute, 18 U.S.C. § 1153, known as the Major Crimes Act,[5] creates

---

[4]The General Crimes Act, in its entirety, provides that:

Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively. 18 U.S.C. § 1152.

[5]The Major Crimes Act, in its entirety, provides:

(a) Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, maiming, a felony under chapter 109A, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury (as defined in section 1365 of this title), an assault against an individual who has not attained the age of 16 years, felony child abuse or neglect, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall

federal jurisdiction for cases in which an Indian commits one of a list of enumerated crimes against another Indian in Indian country.

**[2]** Under § 1153, "[a] 'defendant's Indian status is an essential element . . . which the government must allege in the indictment and prove beyond a reasonable doubt.' " *United States v. Cruz*, 554 F.3d 840, 845 (9th Cir. 2009) (quoting *Bruce*, 394 F.3d at 1229). Although there are a variety of statutory definitions[6] of "Indian," Congress has not defined "Indian" as used in §§ 1152 and 1153. *Maggi*, 598 F.3d at 1077.

**[3]** In the absence of a statutory definition, we have applied a two-part test for determining whether a person is an Indian for the purpose of establishing federal jurisdiction over crimes in Indian country. We have concluded that, for a criminal defendant to be subject to § 1153, the government must present evidence to establish that the defendant has a sufficient "degree of Indian blood," and that he has "tribal or fed-

---

be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

(b) Any offense referred to in subsection (a) of this section that is not defined and punished by Federal law in force within the exclusive jurisdiction of the United States shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense. 18 U.S.C. § 1153.

[6]For example, in the Indian Reorganization Act, 25 U.S.C. § 479 *et seq.,* "Indian" is defined to mean "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood." In an unrelated statute, the Indian Financing Act, 25 U.S.C. § 1452, Indian is defined to mean "a member of any Indian tribe . . . which is recognized by the Federal Government as eligible for services from the Bureau of Indian Affairs . . . ."

eral government recognition as an Indian." *Bruce*, 394 F.3d at 1223, 1224.

**[4]** Here, the government's evidence showed that LaBuff is 5/32 Blackfeet Indian.[7] In light of this evidence, LaBuff concedes that he possesses a sufficient degree of Indian blood. The government therefore satisfied the first prong. Thus, we turn to the second prong, i.e. whether the government established that LaBuff was recognized by the government or the Tribe as an Indian. In *Bruce*, we outlined four factors that govern the second prong; those four factors are, "in declining order of importance, evidence of the following: 1) tribal enrollment; 2) government recognition formally and informally through receipt of assistance reserved only to Indians; 3) enjoyment of the benefits of tribal affiliation; and 4) social recognition as an Indian through residence on a reservation and participation in Indian social life." *Bruce*, 394 F.3d at 1224. These factors are not exclusive. *Maggi*, 598 F.3d at 1081.

LaBuff first contends that because he was not an enrolled member in the Blackfeet Tribe, "the government failed to prove the most important factor in determining if the accused has tribal or federal government recognition as an Indian." As LaBuff acknowledges, however, tribal enrollment is not required to establish "recognition" as an Indian. Indeed, "enrollment in an official tribe has not been held to be an absolute requirement for federal jurisdiction, at least where the Indian defendant lived on the reservation and 'maintained tribal relations with the Indians thereon.' " *United States v. Antelope*, 430 U.S. 641, 647 n.7 (1977); *see also United States v. Broncheau*, 597 F.2d 1260, 1263 (9th Cir. 1979) ("Enrollment is the common evidentiary means of establishing Indian status, but it is not the only means nor is it neces-

---

[7]We have recognized varying degrees of Indian blood, including one-eighth, as sufficient for this part of the *Bruce* test. *Bruce*, 394 F.3d at 1223-26.

sarily determinative."). Although LaBuff was not an enrolled member of the Blackfeet Tribe, he resided on the reservation and maintained relations with the Tribe. Thus, we conclude that the absence of any evidence that LaBuff was an enrolled member in the Blackfeet Tribe is not dispositive of his Indian status.

**[5]** Turning to the second *Bruce* factor, the government presented evidence that LaBuff received "government recognition . . . through receipt of assistance reserved only to Indians." *Bruce*, 394 F.3d at 1224. At trial, the government presented the testimony of Helen Butterfly ("Butterfly"), a health records lab technician at the Blackfeet Community Hospital. Butterfly testified that on the basis of LaBuff's classification as an Indian descendant of a tribal member, he was eligible to receive healthcare services at the hospital, which is operated by the federal government and which limits its services to tribal members and other non-member Indians. Butterfly further testified that since May 1979, LaBuff received free healthcare services from the hospital.[8] Because the evidence showed that LaBuff repeatedly accessed healthcare services "reserved only to Indians," we conclude that the government presented sufficient evidence to establish the second most important *Bruce* factor.

**[6]** Similarly, we conclude that because LaBuff frequently received healthcare services on the basis of his status as a descendent of an enrolled member, he enjoyed the "benefits" of his tribal affiliation, as required by *Bruce's* third factor.

**[7]** LaBuff contends that this case is analogous to *United States v. Cruz*, where we concluded that the government

---

[8]Specifically, Butterfly testified that since 1979, LaBuff was seen at the Blackfeet Community Hospital for Well Child care services, walk-in visits, urgent care, and mental health assistance. Butterfly further testified that the hospital's records showed that since 2009, LaBuff sought medical care approximately 10 to 15 times.

failed to satisfy any of the *Bruce* factors. 554 F.3d at 842-43. In discussing the second *Bruce* factor, we found that the government failed to demonstrate "government recognition" of Cruz's Indian status "through *receipt* of assistance reserved only to Indians." *Id.* at 848. (emphasis in original). In so concluding, we noted that the record was completely devoid of evidence showing that Cruz had received any benefits from his tribe. *Id.* Moreover, we specifically rejected the government's argument that the second *Bruce* factor could be established by demonstrating eligibility rather than actual receipt of benefits. *Id.* at 849. By contrast, the evidence presented by the government here showed that the Tribe recognized LaBuff as an Indian and that he repeatedly received and took advantage of healthcare benefits "reserved only to Indians." LaBuff attempts to gloss over these critical facts by arguing that he did not take advantage of *all* of the benefits for which he was eligible. We are not persuaded. In *Cruz*, we simply acknowledged that the receipt of benefits was essential to satisfying the second *Bruce* factor. *Id.* at 848. We, however, did not suggest that the government needed to prove receipt of every benefit for which Cruz was eligible. Consequently, we conclude that the second and third *Bruce* factors can be satisfied by demonstrating receipt of a substantial benefit "reserved only to Indians," such as the free medical care provided to LaBuff.

[8] The fourth and final *Bruce* factor, requires a showing of "social recognition as an Indian through residence on a reservation and participation in Indian social life." *Bruce*, 394 F.3d at 1224. While the record evidence established that LaBuff lived, grew up, and attended school on the Blackfeet Reservation, there was no evidence that he participated in tribal activities or voted in tribal elections. While voting and participating in tribal activities are important for purposes of evaluating this factor, the lack of any such activities, does not preclude a reasonable inference of social recognition, especially where the defendant has lived his entire life on the reservation. Although the evidence relating to the fourth factor

was not particularly strong, it was proper for the jury to consider it in determining whether LaBuff is an Indian for purposes of § 1153.

[9] Finally, we note that in addition to all of the above evidence relating directly to the *Bruce* factors, which are not exclusive, *Maggie*, 598 F.3d at 1081, the government also presented evidence that on multiple occasions, LaBuff was arrested, prosecuted, and convicted under the jurisdiction of the tribal courts.[9] As we observed in *Bruce*, the assumption and exercise of tribal jurisdiction over criminal charges, demonstrates tribal recognition. 394 F.3d at 1227. At the time he was prosecuted, LaBuff did not challenge the authority of tribal officers to arrest him or the exercise of tribal criminal jurisdiction by the Blackfeet Tribal Court.

[10] In sum, the evidence presented at trial, when taken in the light most favorable to the government, was sufficient for any rational factfinder to have found, beyond a reasonable doubt, that LaBuff is an Indian for purposes of § 1153.

AFFIRMED.

---

[9]The facts here are thus distinguishable from those in *Cruz* and *Maggi*, where we previously noted that while the defendants had been prosecuted in tribal court, the record was devoid of any evidence of the outcome of those prosecutions. *Cruz,* 554 F.3d at 850; *Maggi*, 598 F.3d at 1083. In particular, the government presented the testimony of Michael Connelly, a public defender for the Blackfeet Tribal Court, and former tribal prosecutor. Connelly testified that as a tribal prosecutor, he prosecuted LaBuff on at least three occasions for traffic and criminal offenses. Connelly further testified that LaBuff was subsequently convicted of those offenses. Finally, Connelly testified that in the cases he prosecuted, LaBuff did not challenge the jurisdiction of the tribal court on the basis of his alleged status as a non-Indian.