**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

EDGAR MIKE ALVIREZ, JR.,
*Defendant-Appellant.*

No. 11-10244

D.C. No.
3:10-cr-08049-DGC-1

OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted June 12, 2012
San Francisco, California

Filed March 14, 2013
Withdrawn April 15, 2013
Resubmitted July 15, 2016
Filed August 1, 2016

Before: Dorothy W. Nelson, Johnnie B. Rawlinson,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Rawlinson

**SUMMARY[*]**

**Criminal Law**

The panel reversed a conviction for assault resulting in serious bodily injury on an Indian reservation, in violation of 18 U.S.C. §§ 1153 and 113(a)(6), and remanded.

The panel held that the district court abused its discretion when it determined that a Certificate of Indian Blood offered into evidence by the government in order to establish Indian status, an essential element of § 1153, was a self-authenticating document under Fed. R. Evid. 902(1). The panel held that this error was not harmless.

The panel held that the district court did not abuse its discretion in denying the defendant's motion *in limine* to exclude references to polygraph evidence, where the defendant, who elected not to present his multiple-interrogation defense as a legal strategy, was not denied the opportunity to present his defense.

The panel held that the district court cannot show plain error in the district court's application of enhancement under U.S.S.G. § 2A2.2 for infliction of permanent or life-threatening injury.

The panel held that double jeopardy does not bar retrial after reversal in this case because the erroneously-admitted

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Certificate of Indian Blood was nevertheless sufficient evidence to support the conviction.

**COUNSEL**

Daniel L. Kaplan (argued), Assistant Federal Public Defender; Jon M. Sands, Federal Public Defender; Office of the Federal Public Defender, Phoenix, Arizona, for Defendant-Appellant.

Heather H. Sechrist (argued), Assistant United States Attorney; United States Attorney's Office, Phoenix, Arizona; for Plaintiff-Appellee.

**OPINION**

RAWLINSON, Circuit Judge:

Edgar Alvirez, Jr. (Alvirez) appeals his jury conviction and sentence for assault resulting in serious bodily injury on an Indian reservation, in violation of 18 U.S.C. §§ 1153 and 113(a)(6).

We have jurisdiction pursuant to 28 U.S.C. § 1291 to review the district court's judgment. We conclude that the district court abused its discretion when it admitted the unauthenticated Certificate of Indian Blood as evidence to meet the elements of the governing statute. Accordingly, we reverse Alvirez's conviction and remand for further proceedings. Because other issues raised by Alvirez will likely arise in the event of a retrial, we address them now in

the interest of judicial economy.  *See United States v. Wiggan*, 700 F.3d 1204, 1216 (9th Cir. 2012).

## I.  BACKGROUND

### A.  The Assault

On November 3, 2009, at the home of Mary Grace Alvirez (Mary Grace), Drametria Havatone (Havatone) discussed the fact that Alvirez, Mary Grace's son, was not assisting his mother financially.  Havatone initiated this conversation in the presence of Alvirez, Mary Grace, Brittany Davis (Davis), Alvirez's girlfriend and Havatone's cousin, and Denisha Siyuja (Siyuja).  As the discussion progressed, a physical altercation ensued.  Davis and Siyuja punched and kicked Havatone as they forcibly and physically removed her from the house.

Having forced Havatone outside, Davis and Siyuja continued the physical assault, eventually knocking Havatone to the ground.  While Havatone was prone on the concrete, Alvirez stepped on Havatone's ankle.

Hualapai Nation Police Officer Michael Williams (Officer Williams) was dispatched to the scene.  Finding Havatone lying in the road, Officer Williams asked Havatone if she needed medical assistance, to which she responded affirmatively.  Officer Williams called paramedics, who drove Havatone to the Hualapai Mountain Medical Center. She was subsequently transferred to the Kingman Regional Medical Center, where Dr. Emmett McEleney (Dr. McEleney), an orthopedic surgeon, repaired her broken ankle by inserting nine screws and a metal plate.

*B.  The Investigation*

Officer Williams initially obtained statements from Mary Grace, Davis, and Alvirez (first interview).  Once Officer Williams learned that Havatone's ankle was broken, he reclassified the crime from a simple assault to an aggravated assault, which required referral to the Federal Bureau of Investigation (FBI).

On November 9, 2009, FBI Special Agent Margo Barber (Agent Barber) and Detective Sam Tsosie (Detective Tsosie) of the Hualapai Nation Police Department, interviewed Alvirez outside his home (second interview).  During the second interview, the investigators asked Alvirez if he would submit to a polygraph test.  Alvirez acknowledged that he knew what a polygraph test was and agreed to submit to the test.

On January 26, 2010, Agent Barber and Detective Tsosie arrived at Alvirez's home to continue the investigation. Agent Barber asked Alvirez if he remembered stating that he would be willing to undergo a polygraph examination. Alvirez acknowledged the conversation and stated that he was still willing to submit to the polygraph test.  Agent Barber and Detective Tsosie drove Alvirez to the police station to have FBI Special Agent Brian Fuller (Agent Fuller) administer the polygraph examination.

Agent Fuller advised Alvirez of his *Miranda*[1] rights before administering the polygraph examination.  While Agent Barber and Deputy Tsosie were present, Agent Fuller reviewed the polygraph consent forms with Alvirez.  During

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

the polygraph exam, only Agent Fuller was present and Alvirez denied jumping on Havatone's leg and breaking it.

Agent Fuller initiated the post-polygraph interview (third interview) by informing Alvirez that his results signaled deception.   After receiving the information regarding deception, Alvirez admitted to stepping hard on Havatone's leg.  Immediately following Alvirez's oral statement, Agent Fuller typed and presented the written statement to Alvirez. Alvirez signed the typed statement, acknowledging that it was given voluntarily and that it was "true, accurate, and correct." Agent Barber and Detective Tsosie then rejoined Agent Fuller and Alvirez for the continued post-polygraph interview conducted by Agent Barber.   Alvirez was subsequently charged with assault resulting in serious bodily injury.

### C.  Pre-Trial Motion Hearing and Trial

Prior to trial, Alvirez filed a motion *in limine* to exclude any reference to his polygraph examination.  The government responded that it had no intention of referring to the polygraph examination, unless Alvirez "opened the door" by suggesting that his confession was coerced or that the government acted improperly.  The district court confirmed the government's intention of omitting any reference to the polygraph test.   The court determined that even though polygraph examinations are not "per se inadmissible," this circuit was still "leery of polygraph evidence."

The district court then heard arguments from both parties regarding what could be considered "opening the door" for admission of polygraph evidence.  The defense stated that it might want to clarify the amount of time Agent Fuller spent with Alvirez before Alvirez confessed.  The court restated the

defense's proposed argument that Alvirez on two previous occasions denied assaulting Havatone and confessed during the third interview, where three officers were present, and after being alone with one of the officers for an hour and a half. The government took the position that the defense's described clarification would "open the door" to introduction of the polygraph evidence.

After hearing from both sides, the district court recognized that the defense should be able to make the described argument as part of its case. However, the district court also acknowledged that it would be unfair to allow the defense to state its argument without allowing the government to give "an accurate picture of what happened," including administration of the polygraph examination. Ultimately, the district court stated its preference to avoid any mention of the polygraph, but deferred ruling on the admissibility of polygraph evidence until the issue "play[ed] out in the courtroom." The district court clarified that its ruling was in no way intended to limit the defense's presentation of its case. The district court then denied the motion *in limine*.

During trial, Officer Williams testified that a document presented by the government was a Certificate of Indian Blood (Certificate), although initially he did not recognize the document. Officer Williams identified the Certificate as a way to determine a person's quantum of Indian blood and whether the person was a registered member of a tribe. Officer Williams testified from examining the document that the Certificate was issued by the Colorado River Indian Tribes (CRIT), and that he felt a raised seal on the document.

Defense counsel objected to Officer Williams' attempted authentication of the Certificate, challenging Officer Williams' statement as hearsay, because Officer Williams had no affiliation with the CRIT sufficient to authenticate the Certificate. The government responded that the Certificate was a self-authenticating document. When defense counsel was unable to identify a reason that the Certificate was not self-authenticating, the judge overruled the defense objection and admitted the Certificate into evidence.

During Havatone's testimony, she identified her own Certificate of Indian Blood. Havatone testified that the Certificate signified that she was an enrolled member of an Indian tribe. Havatone added that she could feel the raised Hualapai reservation seal on her Certificate. In addition, she stated that Alvirez was "a Hualapai member of our reservation." The court also admitted Havatone's Certificate into evidence.

Havatone then testified about her assault. She recalled that after being dragged outside of Mary Grace's house, she was lying on her stomach. Alvirez came outside and stepped on her ankle while she was lying on the concrete. Havatone described feeling extreme pain in her leg, and hearing her ankle crack.

Dr. McEleney testified that the fracture to Havatone's ankle was severe, necessitating stabilization with surgical grade stainless steel, resulting in the potential long-term effect of posttraumatic osteoarthritis. The doctor explained that posttraumatic osteoarthritis occurs after physical trauma to a limb, and usually develops earlier than normal arthritis. He also testified that the hardware installed in Havatone's

ankle may need to be replaced more frequently than if the hardware had been installed in another area of the body.

After the jury found Alvirez guilty as charged, the district court imposed a sentence of thirty-seven months. Alvirez filed a timely notice of appeal.

## II. STANDARDS OF REVIEW

The decision to admit evidence is reviewed for an abuse of discretion. *See McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 953 (9th Cir. 2011). A district court's acceptance of evidence as authentic is also reviewed for abuse of discretion. *See United States v. Estrada-Eliverio*, 583 F.3d 669, 672 (9th Cir. 2009).

Generally, we review the ruling on a motion *in limine* for abuse of discretion. *See United States v. Ross*, 206 F.3d 896, 898 (9th Cir. 2000). However, we review *de novo* whether the ruling precludes the presentation of a defense. *See id.* at 898–99.

Criminal sentences are generally reviewed for an abuse of discretion and are not reversed, unless there is a "procedural error or substantive unreasonableness." *United States v. Gonzalez-Aparicio*, 663 F.3d 419, 426 (9th Cir. 2011), *as amended* (citation omitted). The "interpretation and application of the Guidelines is usually reviewed de novo. . . ." *Id.* (citations omitted). When the defendant has failed to object, review is for plain error. *See United States v. Charles*, 581 F.3d 927, 932 (9th Cir. 2009).

We review a district court's findings of fact to support a sentencing enhancement for clear error. *See United States v. Pearson*, 274 F.3d 1225, 1234 (9th Cir. 2001).

## III.    DISCUSSION

### A.  Determination of Indian Status

Indian status is an essential element of 18 U.S.C. § 1153, "which the government must allege in the indictment and prove beyond a reasonable doubt." *United States v. Zepeda*, 792 F.3d 1103, 1110 (9th Cir. 2015) (en banc) (citation omitted). We apply a two-prong test to determine if this element has been met. *See id.* First, the government must prove that the defendant has "some quantum of Indian blood, whether or not that blood derives from a member of a federally recognized tribe," and second, the government must establish that the defendant has "membership in, or affiliation with, a federally recognized tribe." *Id*. at 1113.

To satisfy the first prong, the government need only prove that the defendant has "some" Indian blood as a descendant of an Indian parent, grandparent, or great-grandparent. *United States v. Bruce*, 394 F.3d 1215, 1223–24 (9th Cir. 2005) (citations omitted). We utilize a four-factor test to assess proof of the second prong. *See id.* at 1224. These factors, listed in decreasing order of importance, are: "1) enrollment in a federally recognized tribe; 2) government recognition formally and informally through receipt of assistance available only to individuals who are members, or are eligible to become members, of federally recognized tribes; 3) enjoyment of the benefits of affiliation with a federally recognized tribe; and 4) social recognition as someone affiliated with a recognized tribe through residence

on a reservation and participation in the social life of a federally recognized tribe." *Zepeda*, 792 F.3d at 1114.

### 1.  Evidence of "Some" Indian Blood

A person who has a parent, grandparent, or great-grandparent "who is clearly identified as Indian" will generally satisfy the requirement that a defendant has "some" Indian blood. *Bruce*, 394 F.3d at 1223–24. A Certificate of Indian Blood or an enrollment certificate may also establish a person's quantum of Indian blood. *See id.*

The government elicited through Officer Williams' testimony that Mary Grace, Alvirez's mother, resided on the Hualapai Indian Reservation. Although this evidence was unrefuted, it is questionable whether it was adequate to meet the required showing of "some" Indian blood. *Id.* (discussing cases where the quantum of blood was part of the evidence). We need not resolve this question because we reverse on different grounds.

### 2.  Tribal or Federal Government Recognition

The second prong of the Indian status element required the government to establish that Alvirez is acknowledged by a federally recognized tribe or by the government as an Indian. *See id.* at 1224. Tribal enrollment in a federally recognized tribe is one of the four types of evidence considered by courts in assessing the required Indian status. *See Zepeda*, 792 F.3d at 1114.

The government moved to admit Alvirez's Certificate to meet the second prong of the Indian status element. The Certificate indicated that Alvirez was an enrolled member of

the CRIT and that his blood quantum is one-fourth CRIT, three-eighths Hualapai, and one-eighth Havasupai. Additionally, Agent Barber testified to Alvirez's residency on the Hualapai reservation, and Havatone testified to Alvirez being a member of the Hualapai reservation.

As in *Zepeda*, the government presented no evidence during Alvirez's trial that any of the tribes listed on his Certificate was a federally recognized tribe. *See id*. at 1110. In *Zepeda*, we clarified that the determination of federal recognition of a tribe is a question of law to be determined by the judge. *See id*. at 1114; *see also United States v. Reza-Ramos*, 816 F.3d 1110, 1122 (9th Cir. 2016). We explained that the government "should present to the judge evidence that the tribe was recognized at the time of the offense, but the judge may also consult other evidence that is judicially noticeable or otherwise appropriate for consideration." *Reza-Ramos*, 816 F.3d at 1122 (quoting *Zepeda*, 792 F.3d at 1114) (internal quotation marks omitted).

The district court admitted the Certificate as a self-authenticating document. On appeal, Alvirez challenges the district court's admission of the Certificate as a self-authenticating document. The government responds that Alvirez waived his right to raise this issue on appeal. We reject the government's waiver argument. When the district court judge "makes a definitive ruling" admitting evidence, there is no need to renew the objection to preserve the claimed error. *United States v. Sepulveda-Barraza*, 645 F.3d 1066, 1070 (9th Cir. 2011) (quoting Fed. R. Evid. 103(b)). During trial, defense counsel objected to admission of the Certificate as hearsay and because the proponent of the Certificate was not affiliated with the issuing Tribe. The government responded that the Certificate was a self-

authenticating document.   After visually examining the Certificate, the district court asked defense counsel for a reason underlying her position that the Certificate was not a self-authenticating document.  When defense counsel could not readily articulate a reason, the district court overruled the objection.  Because the district court made this definitive ruling on the admissibility of the Certificate and because it was clear, in context, that Alvirez's objection was that the document had not been properly authenticated, Alvirez preserved his objection to the authentication of the Certificate.  *See id*.

Alvirez contends that documents issued by Indian Tribes cannot be self-authenticating because the tribes are not political subdivisions as described in Fed. R. Evid. 902(1).**[2]** Additionally, Alvirez argues that the government could not authenticate the document through Officer Williams'

---

**[2]** Fed. R. of Evid. 902(1) (2010) provides:

Self-authentication

. . .

(1) Domestic public documents under seal.   A document bearing a seal purporting to be that of the United States, or of any State, district, Commonwealth, territory, or insular possession thereof, or the Panama Canal Zone, or the Trust Territory of the Pacific Islands, or of a political subdivision, department, officer, or agency thereof, and a signature purporting to be an attestation or execution.

testimony because Officer Williams did not meet the requirement set forth in Fed. R. Evid. 902(2).**[3]** We agree.

Authentication is a prerequisite to the admission of evidence, satisfied by establishing that the proferred item is in fact what it purports to be. *See Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002), *as amended*. Authentication establishes the genuineness of evidence and is a special aspect of relevancy. *See id.* at 773 n.7. Evidence may be authenticated by presenting testimony from an individual who has sufficient familiarity with the proferred evidence to identify the evidence and inform the court of the circumstances under which the evidence was created. *See United States v. Pelisamen*, 641 F.3d 399, 411 (9th Cir. 2011). In sum, the individual who authenticates the evidence seeks to convince the court that the proferred evidence is genuinely what it purports to be. *See Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532–33 (9th Cir. 2011). However, certain documents are characterized as self-authenticating, requiring no extrinsic evidence of genuineness to be admitted into evidence. *See United States v. Mateo-Mendez*, 215 F.3d

---

**[3]** Fed. R. of Evid. 902(2) (2010) provides:

Self-authentication

. . .

(2) Domestic public documents not under seal. A document purporting to bear the signature in the official capacity of an officer or employee of any entity included in paragraph (1) hereof, having no seal, if a public officer having a seal and having official duties in the district or political subdivision of the officer or employee certifies under seal that the signer has the official capacity and that the signature is genuine.

1039, 1043 (9th Cir. 2000) (explaining self-authentication). Pursuant to Fed. R. Evid. 902(1), self-authentication requires a seal from an entity listed in the rule and a signature of attestation or execution.[4]  *See* Fed. R. Evid. 902(1).  Federal Rule of Evidence 902(1) specifically lists the entities that may issue self-authenticating documents and Indian tribes are not among those listed.  *See* Fed. R. Evid. 902(1) (listing the United States; a State of the United States; a commonwealth, territory, or insular possession of the United States; the Panama Canal Zone; and the Trust Territory of the Pacific Islands); *see also United States v. Weiland*, 420 F.3d 1062, 1072 (9th Cir. 2005) (explaining that a party may not circumvent the requirements of authentication when the plain language of a rule lists the requirements necessary for authentication).

The plain language of Rule 902(1) specifically lists the entities that may issue self-authenticating documents.  The Rule is not ambiguous and must be applied as written.  *See Gardenhire v. IRS (In re Gardenhire)*, 209 F.3d 1145, 1152 (9th Cir. 2000).  Because Indian tribes are not listed among the entities that may produce self-authenticating documents,[5]

---

[4] An attestor certifies that a document is what it purports to be.  *See Mateo-Mendez*, 215 F.3d at 1043.  An executor confirms preparation of the document.  *See* Christopher B. Mueller and Laird C. Kirkpatrick, Authentication and Identification:  Rules 901 to 903, 5 Federal Evidence § 9:30 (3d ed.) (June, 2012), *available at* Westlaw FEDEV § 9:30.

[5] The government argues that tribes are "political subdivisions" of the United States and thus captured by the text of Rule 902(1).  We disagree. Tribes are "sovereigns or quasi sovereigns," *Kiowa Tribe of Okla. v. Mfg. Tech., Inc.*, 523 U.S. 751, 757 (1998), not one of the political entities into which the federal government is divided, *see Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978) ("As separate sovereigns pre-existing the Constitution, tribes have historically been regarded as unconstrained

the district court abused its discretion in admitting the Certificate pursuant to Federal Rule of Evidence 902(1) as a self-authenticating document. *See United States v. Nguyen*, 465 F.3d 1128, 1130 (9th Cir. 2006)[6] (articulating that a district court abuses its discretion when it admits evidence "based on an erroneous view of the law") (citation and internal quotation marks omitted).[7]

Alvirez's Indian status is at the heart of this matter. Indeed, a "defendant's Indian status is an essential element of a § 1153 offense which the government must allege in the indictment and prove beyond a reasonable doubt." *Bruce*, 394 F.3d at 1229 (citations omitted). Admission of the Certificate allowed the government to establish both elements of Indian status. First, the quantum blood information indicated that Alvirez met the "some" Indian blood requirement. *Id.* at 1223; *see also Reza-Ramos*, 816 F.3d at 1121. Second, the Certificate established that Alvirez was an enrolled member of the CRIT. *See Bruce*, 394 F.3d at 1224; *see also Zepeda*, 792 F.3d at 1116. Absent admission of the

---

by those constitutional provisions framed specifically as limitations on federal or state authority.").

[6] At oral argument, the government conceded that Federal Rule of Evidence 902(4) is inapplicable to this case because, in this case, there was no "custodian that certified that this was a document" from tribal records. Therefore, we do not address whether the document could have been admitted under Rule 902(4).

[7] For the same reason, the Certificate was not self-authenticating under Rule 902(2). That rule allows for the authentication of documents "purporting to bear the signature in the official capacity of an officer or employee of any entity included in" Rule 902(1). Fed. R. Evid. 902(2). Because tribes are not among the entities included in Rule 902(1), Rule 902(2) is inapplicable.

Certificate, it is questionable whether the government would have established Alvirez's Indian status to the satisfaction of the jury because the only other evidence of Indian status was Havatone's and Agent Barber's testimony that Alvirez lived on the reservation, and Havatone's testimony that Alvirez was a member of the Hualapai Tribe, a different tribe than reflected in the Certificate.  Consequently, it was more likely than not that the admission of the Certificate materially affected the verdict.  *See Wiggan*, 700 F.3d at 1215.  Because the error was not harmless, we vacate Alvirez's conviction and remand for proceedings consistent with the reasoning in this opinion.

### B. *Denial of Alvirez's Motion* In Limine *to Exclude References to Polygraph Evidence*

Citing *Crane v. Kentucky*, 476 U.S. 683, 690 (1986), Alvirez asserts that the district court erred when it denied his motion *in limine* to exclude references to the polygraph evidence, because it "deprived him of his constitutional right to present a complete defense."  As discussed above, when the district court denied Alvirez's motion *in limine*, it acknowledged the defense's potential argument that Alvirez was coerced into a confession during the third interview.  Prior to administering the polygraph, FBI Agent Fuller verified Alvirez's willingness to talk to him and advised Alvirez of his *Miranda* rights.  Agent Fuller asked Alvirez if he had been drinking, whether he was well rested, and whether he was taking medications.  Alvirez responded that he had not drunk alcoholic beverages, but that he was taking phenobarbital and blood pressure medication.  Alvirez also stated that he was tired due to a lack of sleep the previous night.  However, Agent Fuller testified that he did not note

any weariness or impairment, and that Alvirez indicated "he was okay to take the test."

The government stated that it had no intention of referring to Alvirez's polygraph examination or its results in its case-in-chief.  However, once the government learned that Alvirez planned to pursue the defense that multiple interrogations and alleged coercion led to his confession, the prosecution responded that the defense would be opening the door for the prosecution to discuss the polygraph examination and its results.  The district court denied Alvirez's motion *in limine* seeking to exclude polygraph evidence.  However, the district court specifically noted that its ruling was in no way intended to deprive Alvirez of his right to present a complete defense.

Alvirez now argues that he chose not to raise the multiple interrogation defense for fear that the prosecution would introduce the polygraph examination evidence, which would be unduly prejudicial.  According to Alvirez, the district court's ruling deprived him of an opportunity to present a complete defense, as was the case in *Crane*.

In *Crane*, the defendant was convicted of murder.  *See Crane*, 476 U.S. at 686.  When he was initially arrested, the defendant was sixteen years old.  *See id.* at 684.  After being indicted, the defendant moved to suppress his confession. *See id.* at 684–85.  During the evidentiary hearing, the defendant testified that he had been held for hours in a windowless room, surrounded by up to six police officers, repeatedly denied his requests to contact his mother, and forced into making the confession.  *See id.* at 685.  The trial court denied the motion.  *See id.*

During his opening statement, defense counsel stated that there were a number of reasons the defendant's confession should not be considered trustworthy or credible. *See id.* In response to this statement, the prosecution moved *in limine* to exclude the defense's introduction of evidence relating to the circumstances underlying the defendant's confession. *See id.* at 685–86. The prosecution argued that the circumstances related to the voluntariness of the statement, and that the court had already resolved that issue. *See id.* at 686. The court granted the prosecution's motion. *See id.* The Kentucky Supreme Court upheld the trial court's ruling. *See id.*

The United States Supreme Court reversed, holding that the defendant's due process rights under the Fourteenth Amendment and the Confrontation Clause were violated. *See id.* at 690. The Court held that the manner in which a confession is elicited is important to determine the "reliability and credibility" of the confession. *Id.* at 691. The Supreme Court noted that even voluntary statements may not be conclusive of guilt. *See id.* at 689. Excluding evidence relevant to the credibility of the confession was a clear violation of the defendant's right to present a defense and denied him a fair trial. *See id.* at 690–91.

In this circuit, it is well-established that a polygraph examination may not be admitted to prove the veracity of statements made during the examination. *See United States v. Bowen*, 857 F.2d 1337, 1341 (9th Cir. 1988). However, polygraph evidence may be admissible as "an operative fact." *Id.* During the hearing on the motion *in limine*, the district court expressed the view that polygraph tests should rarely be mentioned during trial. The district court expressed that its "instinct [was] it shouldn't come in. . . ." However, the

district court clarified that it would not limit Alvirez's defense, as he should be able to present "whatever defense you can." Nevertheless, the court forewarned Alvirez that his strategy might result in a reference to the polygraph test by the government. The district court's denial of the motion *in limine* did not prevent Alvirez from calling key witnesses, from presenting specific information in support of his defense, or from refuting an essential element of the government's case. *See United States v. Pineda-Doval*, 614 F.3d 1019, 1033 & n.7 (9th Cir. 2010) (explaining that procedures violating a defendant's right to present a defense involved evidentiary rules that "undermined fundamental elements of the defendant's defense"). In sum, Alvirez's constitutional right to present a complete defense was honored. *See id.* Unlike the defendant in *Crane*, Alvirez was not denied the opportunity to present his defense. Rather, he elected not to present his defense as a legal strategy. *See*, *e.g.*, *United States v. Main*, 443 F.2d 900, 901 (9th Cir. 1971) (articulating that defense counsel's informed judgment not to present an intoxication defense, as a matter of strategy, did not deprive defendant of a fair trial).

### C. *Application of the Sentencing Guidelines*

Alvirez contends that the district court plainly erred in its calculation of his sentencing by applying a seven-level

enhancement under U.S.S.G. § 2A2.2[8, 9] for infliction of a permanent or life-threatening bodily injury.  The government counters that Alvirez waived his right to appeal the enhancement when he failed to object to the pre-sentence report or the calculated sentencing range.

A defendant does not waive his right to appeal a district court's legal determinations simply because he failed to object.  *See United States v. Jimenez*, 258 F.3d 1120, 1123 (9th Cir. 2001).  Instead, we review for plain error.  *See id.* at 1124.

---

[8] Alvirez was sentenced on May 27, 2011.  Therefore, references to the United States Sentencing Guidelines Manual (U.S.S.G. or Guidelines) are to the November 2010 Guidelines.

[9] § 2A2.2. Aggravated Assault

    (a) Base Offense Level: 14

    (b) Specific Offense Characteristics

        . . .

    (3) If the victim sustained bodily injury, increase the offense level according to the seriousness of the injury:

| Degree of Bodily Injury | Increase in Level |
|---|---|
| (A) Bodily Injury | add 3 |
| (B) Serious Bodily Injury | add 5 |
| (C) Permanent or Life-Threatening Bodily Injury | add 7 |

"Plain error is (1) an error that (2) is plain, (3) affects substantial rights, and (4) seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Blinkinsop*, 606 F.3d 1110, 1114 n.2 (9th Cir. 2010) (citation omitted). An error is plain when it is "clear" or "obvious." *Charles*, 581 F.3d at 933 (citation omitted).

United States Sentencing Guideline Section 2A2.2(b)(3)(C) allows the district court to increase the defendant's offense level by seven levels if the offense resulted in permanent or life-threatening injury. The district court's factual findings underpinning its application of a sentence enhancement are reviewed for clear error. *See Pearson*, 274 F.3d at 1234–35. The district court credited Dr. McEleney's testimony that Havatone's ankle required repair with surgical grade steel and nine screws to stabilize it, that it may be necessary to replace this hardware more often, and that the long-term effects of this injury may cause posttraumatic osteoarthritis. The district court committed no clear error in equating these effects to a permanent bodily injury. *See id.* (approving the district court's reliance on evidence from the trial to apply a sentencing enhancement). Because the district court properly applied the enhancement, Alvirez cannot show plain error. *See United States v. Tafoya-Montelongo*, 659 F.3d 738, 744 (9th Cir. 2011).

## D.  Double Jeopardy

Alvirez urges us to enter a judgment of acquittal, rather than remand for a new trial, because there was insufficient evidence to establish his Indian status. The double jeopardy clause does not bar retrial after a reversal based on the erroneous admission of evidence, however, if this evidence was nevertheless sufficient to support the conviction. *See*

*Lockhart v. Nelson*, 488 U.S. 33, 40 (1988).  As we discussed above, here, a rational trier of fact could determine that the evidence adduced at trial—including the Certificate and testimony from Havatone and Agent Barber—established both elements of Indian status: "some" Indian blood, and membership or affiliation in a federally recognized tribe at the time of the offense.  *See Bruce*, 394 F.3d at 1223; *see also Reza-Ramos*, 816 F.3d at 1121; *Zepeda*, 792 F.3d at 1113.[10] As "*any* rational trier of fact could have found the essential element[] [of Indian status] beyond a reasonable doubt," sufficient evidence supports this element and retrial does not offend the double jeopardy clause.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original).

## IV.    SUMMARY

In accordance with our recent en banc decision in *Zepeda*, we conclude that the determination of federal recognition of a tribe is a question of law to be resolved by the judge.  We also conclude that the district court abused its discretion when it determined that the Certificate of Indian Blood offered into evidence by the government was a self-authenticating document under Federal Rule of Evidence 902(1).  Because the error was not harmless, we reverse the conviction.  The district court did not abuse its discretion when it denied the motion *in limine*, thus it did not deny Alvirez his right to present a defense.  Finally, the district court's application of the sentencing enhancement for permanent bodily injury was not clearly erroneous.

---

[10] Although the Certificate is dated January 18, 2011, a reasonable juror could determine that the certified document was printed by the Tribe on that date, and that Alvirez was an Indian at the time of the charged offense.

**CONVICTION REVERSED AND CASE REMANDED.**